**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anissa B. Groves, ) | No. CIV 03 1887-PHX-MHM |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| Wyeth Pharmaceuticals; and Subir Roy,) | |
| M.D., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

Defendants Wyeth Pharmaceuticals ("Wyeth") and Subir Roy, M.D. ("Dr. Roy") have each filed a motion for summary judgment under Fed.R.Civ.P. 56 (Doc. 109 & 111) as to all claims asserted by Plaintiff in her complaint. Plaintiff has filed responses in opposition to both motions (Doc. 114 & 117) and Defendants each have filed a reply. (Doc. 124 & 126). Each party has supported their respective positions on summary judgment with a statement of facts. The Court heard oral argument on Defendants' summary judgment motions on February 2, 2006. The Court has considered the parties' arguments and all documents submitted in support and now enters this Order on these summary judgment proceedings.

I.

Background Facts.

Plaintiff has filed a complaint asserting the following claims for relief: sexual harassment under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2(a), and the Arizona

Civil Rights Act, A.R.S. § 41-1463  (Count One); retaliation, in violation of Title VII and the Arizona Civil Rights Act, A.R.S. §41-4164 (Count Two);[1] and, negligent supervision (Count Three), all against Wyeth; the state or common law tort of civil battery (Count Four) against Dr. Roy; and, intentional infliction of emotional distress (Count Five) against both Defendants. Plaintiff seeks compensatory damages, lost wages, attorneys' fees and punitive damages. Generally, Plaintiff alleges that she was sexually harassed in October 2001 by Dr. Roy, an independent contractor who worked with Wyeth, and that Wyeth retaliated against her for complaining about the alleged sexual harassment. Plaintiff has asserted jurisdiction based on 28 U.S.C. § 1331 as to her Title VII claims and supplemental jurisdiction under 28 U.S.C. § 1367 as to her state or common law claims. (Complaint at para. 2).

At the time of the events alleged, Wyeth had in place a sexual harassment policy. This policy provided in relevant part that the following conduct was prohibited: "Sexual harassment [] between employees in the workplace, as well as between employees and outside vendors, consultants, clients, visitors, etc."

Plaintiff became employed by Wyeth as a territory representative in northern California in August 2000. A few months after starting work in the field, she was transferred to Phoenix at her request in March 2001, serving as a Wyeth sales representative. Wyeth claims that its managers and supervisors noted deficiencies in Plaintiff's work performance in July 2001. Wyeth managers Audrey Ozols (who was Plaintiff's direct supervisor), Jana Kidd and April Vaughn discussed Plaintiff's alleged deficient work performance during this period but did not place Plaintiff on a Performance Improvement Plan ("PIP") because Ms. Ozols was scheduled to go on maternity leave in August 2001. Plaintiff points out, however, that she was rated as a "solid performer" and "meets expectations" in her October 2000 to September 2001 Annual Performance Evaluation.

---

[1]The Arizona Civil Rights Act is generally identical to Title VII and therefore federal Title VII case law is persuasive on such claims. Bodett v. Coxcom, Inc., 366 F.3d 736, 742 (9th Cir. 2004).

- 2 -

In the fall of 2001, Plaintiff pursuant to her duties as a Wyeth sales representative, arranged a dinner event in Phoenix for October 24, 2001 and asked Dr. Roy to present and educate her clients on product information. Dr. Roy was a regular visiting speaker under contract with Wyeth and was listed on Wyeth's approved list of visiting speakers on the topic of women's health and hormone treatment with Wyeth products. Wyeth paid Dr. Roy an honorarium of approximately $1,250.00 per presentation, plus expenses, per speaking engagement. Dr. Roy was approved by Wyeth's Visiting Speaker's Bureau to speak at the program Plaintiff had planned for October 24-26, 2001. Dr. Roy is not a Wyeth employee and has no employment relationship with Wyeth.

As part of her employment duties, Plaintiff was responsible for transporting Dr. Roy between programs, and to and from the airport, in her company vehicle. Two or three days before Dr. Roy's arrival, Plaintiff's interim supervisor April Vaughn telephoned Plaintiff and warned her about Dr. Roy's "flirtatious" nature and of rumors of his past inappropriate conduct with women. Ms. Vaughn testified during her deposition that her comments to Plaintiff were based solely on rumor. Wyeth claims to have had no actual knowledge of any flirtatious behavior or prior assault between Dr. Roy and any Wyeth employee.

On the evening of October 24, 2001, after Dr. Roy's speaking engagement had been concluded, Plaintiff in her company car drove Dr. Roy to the front of his hotel. During their association, Plaintiff and Dr. Roy allegedly had discussed personal matters such as failed relationships. Upon arriving at Dr. Roy's hotel, Plaintiff stopped the car near the main doors and while the engine was running, Dr. Roy allegedly suggested that Plaintiff come to his hotel room, and that she join him in the hotel swimming pool or Jacuzzi. Dr. Roy also suggested that Plaintiff meet him in his room for a massage the next day. Plaintiff allegedly rejected Dr. Roy's invitation. She further contends that Dr. Roy suddenly placed his hand high on her thigh for about two or three seconds and kissed her on the lips. Plaintiff testified in her deposition that the alleged kiss was "instantaneous" and lasted for "one second" and that Dr. Roy "pulled away because he sensed that [she] was not responding." Dr. Roy has

1  denied making these advances toward the Plaintiff but has admitted Plaintiff's allegations for
2  purposes of his motion for summary judgment.

3  Plaintiff allegedly insisted that Dr. Roy leave the vehicle. She testified during her
4  deposition that she sought a "polite way of getting him out of the car" and suggested that he
5  had had too much to drink. Plaintiff testified that she "was laughing about it" as a "defense
6  mechanism" and "did not want to hurt Dr. Roy's feelings." Dr. Roy left Plaintiff's vehicle and
7  the Plaintiff never saw him again.

8  The next morning, October 25, 2001, Dr. Roy left a telephone message for Plaintiff
9  confirming that he had arranged for both of them to have a massage and asking her to first
10 come to his room, providing his room number. Plaintiff responded by leaving a message for
11 Dr. Roy indicating her objection to his conduct and asking to be treated in a professional
12 manner. Plaintiff testified that Dr. Roy left another message on October 29, 2001 indicating
13 that he hoped that they could get together in the coming weeks to talk. About ten days later,
14 Dr. Roy left a message asking why he had not received payment for the program. Plaintiff
15 had no further calls from Dr. Roy.

16 On October 25, 2001, Plaintiff reported the October 24th incident involving Dr. Roy
17 to her temporary supervisor, April Vaughan, and to Jana Kidd, Wyeth's Area Business
18 Director. Ms. Vaughn told Plaintiff that she would never have to deal with Dr. Roy again.
19 Ms. Kidd added that if Plaintiff heard from Dr. Roy, she was to let her know immediately.
20 Both Ms. Vaughn and Ms. Kidd indicated that this was not the first time Dr. Roy's
21 professional conduct had been called into question. Ms. Kidd acknowledged the severity of
22 the incident and may have characterized Dr. Roy as a "scumbag." On October 26, 2001, Ms.
23 Kidd asked Plaintiff if she wanted to change her cellular telephone number at Wyeth's
24 expense. Plaintiff submitted a written complaint letter to Ms. Kidd on October 31, 2001.

25 In addition, on or about October 24, 2001, Plaintiff reported the incident to Area Field
26 Trainer Bob Joice who discussed it with Ms. Kidd. Ms. Kidd reported the incident to Jeff
27 Conklin, Wyeth's Vice President of Women's Healthcare, who was very concerned about
28 what had happened. It is undisputed that Plaintiff never again dealt with or saw Dr. Roy.

1   Wyeth officials prohibited Dr. Roy from speaking in Area 92, Plaintiff's territory, as
2   a direct result of Plaintiff's complaint.  Wyeth management advised its district managers that
3   the company would no longer use Dr. Roy in any area after its existing contractual
4   obligations with him were completed.  According to Plaintiff, Dr. Roy's last speaking
5   engagement for Wyeth was on November 7, 2002.  Plaintiff contends that Wyeth did not
6   inform Dr. Roy of Plaintiff's complaint.

7   Plaintiff has cited other alleged "sexual harassing" incidents between Dr. Roy and
8   Wyeth female employees. On the morning of October 25, 2001, Dr. Roy asked Wyeth Sales
9   Representative Tess Daniels, who had accompanied him to a breakfast meeting, if she was
10  married.  When Ms. Daniels answered yes, Dr. Roy asked her if she was happily married.
11  Ms. Daniels testified during her deposition that this "innuendo" made her feel uncomfortable
12  and she reported it to Wyeth management. Sales Representative Holly Adelman reported that
13  at this same breakfast meeting, Dr. Roy made her uncomfortable by the way he looked at her.
14  In an undated incident, a female nurse practitioner who was a guest  at a Wyeth Visiting
15  Speaker presentation complained that Dr. Roy had inappropriately asked her to eat from his
16  fork.

17  Plaintiff has submitted the affidavit of Ms. Lena Leong, a Wyeth pharmaceutical
18  representative for nineteen years.  Ms. Leong states that Dr. Roy has served as a speaker for
19  her many times and that she has personally observed Dr. Roy flirt with a number of women.
20  Plaintiff states that after her complaint against Dr. Roy, numerous other Wyeth employees
21  reported knowing of Dr. Roy's reputation for flirtatiousness.

22  Following the October 24th incident involving Dr. Roy, Plaintiff continued to work
23  her normal hours and shift.  Wyeth managers took precautions so that there would be a male
24  representative or manager in attendance while going forward with the programs that had been
25  scheduled with Dr. Roy.

26  On November 1, 2001, Plaintiff's overall performance rating was slightly below
27  "meets expectations."  Plaintiff states that between August 2001 and April 2002, Wyeth
28

- 5 -

1  management was inconsistent and that she was without a full-time, permanent supervisor to
2  whom she could go for assistance.

3  On January 18, 2002, Wyeth management, via Ms. Ozols, put Plaintiff on a non-
4  disciplinary PIP. In February 2002, Mr. Joice, Plaintiff's trainer, reported to Ms. Ozols that
5  Plaintiff was deficient in her selling skills and product knowledge. Shortly after Plaintiff was
6  placed on the PIP, Mike Dickinson became the new district manager and Plaintiff's
7  supervisor. Mr. Dickinson decided to evaluate Plaintiff anew. At their first meeting, Plaintiff
8  informed Mr. Dickinson that she had been working part time but had not been
9  communicating with Wyeth's Human Resources Department. Mr. Dickinson began to ride
10 with Plaintiff during her duties, referred to as "field supervision visits" or "ride alongs."
11 After riding with Plaintiff, Mr. Dickinson decided to renew Plaintiff's PIP in May 2002.

12 Mr. Dickinson required Plaintiff to perform outside assignments in an effort to
13 improve Plaintiff's selling skills and product knowledge. Plaintiff states that she had
14 successfully completed her assignments and that the extra work was part of a pattern of
15 retaliation. According to Plaintiff, her sales results remained "good" and she was ranked
16 second in sales in her district for the period between March 29, 2002 and May 17, 2002.

17 In July 2002, a medical study was released that indicated increased risk of breast
18 cancer and other diseases related to Wyeth's hormone replacement product Prempro.
19 Plaintiff contends that Wyeth continued to utilize the services of Dr. Roy regarding his
20 presentations on hormone replacement therapy to help dispel the negative publicity.

21 Plaintiff requested, and was granted, a stress disability leave from August 9, 2002 to
22 October 25, 2002. Plaintiff states that her stress disability leave resulted in significant part
23 from her negative interactions with Mr. Dickinson. She also states that she had become
24 emotionally distraught as a result of the heightened scrutiny she had received from her
25 managers since she had reported her complaint against Dr. Roy. When she returned to work,
26 Mr. Dickinson told Plaintiff there would be a ten percent layoff based on performance and
27 he had rated her last in the district. On Plaintiff's December 13, 2002 Performance Planning
28 and Appraisal, Mr. Dickinson rated Plaintiff's overall performance as "below expectations."

1   On February 25, 2003, Plaintiff requested that Julie Ralston, Wyeth's Human
2   Resources Senior Manager, provide a reasonable accommodation to permit her to discontinue
3   "ride alongs" with Mr. Dickinson and to assign her to "ride alongs" with another district
4   manager. Ms. Ralston denied her request. Plaintiff claims that as a result of this "sequence
5   of events" and her emotional condition at the time, she refused to continue the "ride alongs"
6   with Mr. Dickinson. She did not, however, refuse to ride with any other Wyeth manager.

7   Mr. Dickinson rode with Plaintiff more times than with other of Wyeth's sales
8   representatives. Mr. Dickinson testified during his deposition that he was attempting to help
9   Plaintiff with her performance deficiencies. Plaintiff states that she believes Mr. Dickinson's
10  actions were part of a pattern of retaliation for her refusal to accept the manner in which
11  Wyeth handled her complaint of sexual harassment against Dr. Roy.

12  Mr. Dickinson made the decision to terminate Plaintiff's employment on April 11,
13  2003. Defendant Wyeth has cited the following reasons in support of this decision. Plaintiff
14  refused to ride with Mr. Dickinson even though she acknowledged that this was part of her
15  job and was specifically outlined in her PIP. Plaintiff stopped entering calls to doctors'
16  offices after February 18, 2003, leading Mr. Dickinson to believe that she had stopped
17  working. Sales representatives are required to enter calls daily.

18  Plaintiff testified that she had decided to leave Wyeth in April 2002 and had
19  mentioned this decision to Mr. Dickinson in confidence. Plaintiff also testified that she was
20  not working full-time as required but did not tell anyone in Wyeth management about her
21  self-created schedule. Plaintiff continued to be paid for working full time.

22  Doctors' offices in Plaintiff's territory complained that Plaintiff was not calling on
23  them. Plaintiff did not acknowledge drug samples pursuant to Wyeth policy.

24  Plaintiff drove a company vehicle while she had a suspended license for a period of
25  months. Driving on a suspended license and not reporting it were violations of Wyeth policy.
26  Plaintiff claims that she did not know her license had been suspended.

27  Plaintiff missed a conference call and arrived late for a ride along with Mr. Dickinson.
28  There was criticism of Plaintiff's selling skills and product knowledge in her file.

1  Mr. Dickinson recommended to his supervisor Ms. Kidd that Plaintiff's employment
2  should be terminated. Ms. Kidd reviewed the matter and concurred with Mr. Dickinson's
3  decision. The decision was reviewed by Wyeth's Human Resources Department and
4  approved. Plaintiff's employment termination became effective on April 25, 2003.

5  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity
6  Commission on October 22, 2002. The EEOC issued Plaintiff a right to sue letter on July
7  2, 2003.

## II.

### Standard of Review.

A motion for summary judgment may be granted only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Material facts are those which might affect the outcome of the suit. ... An issue is genuine if a reasonable trier of fact could find in favor of the nonmoving party." Rivera v. Philip Morris, Inc., 395 F.3d 1142, 1146 (9th Cir. 2005). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e). See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986).

## III.

### Discussion.

A.  Defendant Wyeth's motion for summary judgment as to Plaintiff's federal claims.

   (1)  Wyeth's argument that Plaintiff's sexual harassment claim is time-barred.

A Title VII claimant must file a charge of discrimination with the EEOC "within 180 days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). If the claimant institutes proceedings with a state agency, the charge filing deadline is

- 8 -

1 increased to 300 days after the occurrence of the alleged unlawful employment practice. id.;
2 Hinton v. Pacific Enterprises, 5 F.3d 391, 395 (9th Cir. 1993). A claim is "time barred if it
3 is not filed within these time limits." National R.R. Passenger Corp. v. Morgan, 536 U.S.
4 101, 109 (2002); see also Fonesca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 845
5 (9th Cir. 2004). Defendant Wyeth contends that Plaintiff's last contact with Dr. Roy was
6 "maybe ten days" after October 29, 2001 and that, considering November 10, 2001 as the
7 date of her last contact with him, the outside deadline for filing her sexual harassment claim
8 was September 6, 2002. Plaintiff filed her charge with the EEOC on October 22, 2002, some
9 346 days after the alleged sexual harassment. The complaint therefore was untimely and
10 must be dismissed.

11 Plaintiff contends that her sexual harassment complaint was timely filed because it is
12 not Dr. Roy's conduct that makes Wyeth liable for sexual harassment. Rather, Plaintiff
13 contends that Wyeth's inadequate response after Plaintiff had reported the offending conduct
14 created a hostile work environment. Plaintiff argues that Wyeth's retaliatory conduct began
15 immediately after Plaintiff complained of Dr. Roy's improper sexual advances and
16 contributed to and was an integral part of Plaintiff's hostile work environment. Plaintiff cites
17 the following facts in support of her argument. In or around July 2002, she learned that
18 Wyeth had continued to utilize Dr. Roy for speaking engagements. Wyeth informed Dr. Roy
19 the he no longer would be used as a speaker in Phoenix due to budget constraints, not
20 because of Plaintiff's sexual harassment complaint. Plaintiff sent a letter dated July 9, 2002
21 to Ms. Kidd, Wyeth's Area Business Director, expressing her distress that other women at
22 Wyeth might be subject to Dr. Roy's unwelcome advances if Wyeth failed to take appropriate
23 action. Ms. Kidd allegedly did not investigate this complaint or take any action except to
24 forward Plaintiff's letter to her supervisor in the Human Resources Department. Wyeth
25 continued to employ Dr. Roy as a speaker after news and medical reports of the alleged
26 harmful effects of long-term hormone replacement therapy. Plaintiff contends that because
27 of Wyeth's inadequate response to her complaints, she became increasingly distraught, was
28 diagnosed with post traumatic stress disorder due to the intolerable working conditions and

1  was granted a stress disability leave from August 9, 2002 to October 25, 2002. Plaintiff
2  contends that the alleged retaliation continued even after her return to work, citing Mr.
3  Dickinson's negative attitude and criticism of her work.

4  It was not clear from the parties' summary judgment briefing whether Plaintiff was
5  required to file her EEOC charge within 180 or 300 days of the alleged discriminatory
6  conduct. Counsel clarified at oral argument that Plaintiff's filing period was 300 days from
7  the date of the alleged conduct.

8  In <u>Morgan</u>, the Supreme Court held that "only those acts that occurred 300 days
9  before [the charge was filed] are actionable. .. All prior discrete discriminatory acts are
10  untimely and no longer actionable." <u>Morgan</u>, 536 U.S., at 114-15. The Supreme Court
11  rejected the merger of untimely acts into a hostile work environment claim unless the timely
12  acts are of the same nature as the untimely acts, and serve to continue the hostile work
13  environment in some fashion. <u>Id</u>., at 117-18. Plaintiff must demonstrate a genuine issue of
14  material fact as to the existence of "a series of separate acts, none of which may be actionable
15  on its own, that collectively constitute one 'unlawful employment practice.'" <u>Id</u>., at 117.
16  Plaintiff therefore must show that "the earlier and later events amounted to the 'same type of
17  employment action, occurred relatively frequently, or were perpetrated by the same
18  managers.'" <u>Porter v. California Dept. of Corrections</u>, 383 F.3d 1018, 1028 (9th Cir.
19  2004)(quoting <u>Morgan</u>, 536 U.S. at 116, 120).

20  The recent case of <u>Stanley v. Trustees of the California State University</u>, 433 F.3d
21  1129 (9th Cir. 2006), appears similar to the circumstances presented here. In <u>Stanley</u>, the
22  plaintiff, a college student, made allegations of sexually harassing conduct by one of her
23  professors and faculty advisor. The plaintiff had intermittently been a student at California
24  State University during 1999 and 2000. The last alleged incident of sexual harassment had
25  occurred in May 2000. In September 2000, Plaintiff filed a formal complaint of sexual
26  harassment with the University which resulted in a determination that the professor had
27  violated University Policy. However, the plaintiff was not notified of any disciplinary action
28  taken and thereafter alleged that the University had failed to act on her complaint.

- 10 -

In discussing whether the plaintiff's sexual harassment claim under Title IX was timely, the Ninth Circuit quoted Morgan as holding in part that "hostile environment claims are different in kind from discrete acts ... In order for the charge to be timely, the employee need only file a charge within ... [the limitations period] of any act that is part of the hostile work environment." Id., at 1136. The appellate court rejected the plaintiff's argument that the school's deliberate indifference to the conduct prevented the statute of limitations from beginning to run, stating in relevant part as follows:

> Stanley has not alleged any 'acts' under the Morgan standard within the limitations period that contributed to a hostile environment. In order to establish a sexually hostile environment based on alleged sexual harassment, Stanley must show: '(1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.' *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 892 (9th Cir. 2005)(as amended).
>
> Stanley has not been enrolled at the University since 2000. Unsurprisingly, she has not alleged that she was subjected to any sexually-natured conduct at the University during a period when she was not present. While it is true that we have held that the mere presence of a harassing individual may constitute a hostile environment, *see Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991), we have never held the presence of an individual in a workplace or institution where the plaintiff is not present constitutes a hostile environment. ...
>
> Stanley's argument also runs afoul of [Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 645 (1999)], which requires more than non-responsiveness; it requires that the indifference result in harassment or render her vulnerable to harassment. Stanley has not alleged anything of the sort occurred during the limitations period.

Id. at 1137.

In support of her argument that her charge was timely as based on Wyeth's inadequate reaction to Dr. Roy's conduct which created a hostile work environment, Plaintiff relies on Little v. Windermere Relocation, Inc., 301 F.3d 958 (9th Cir. 2002). In Little, the plaintiff employee was raped three times in a single evening by the representative of a corporate client. When she reported the incident to her company's management officials, she was advised to either put the matter behind her or not discuss it, she was removed from her duties

1 involving the corporate client, and her salary was reduced. Id., at 964-65.  Although the
2 plaintiff in Little had no further contact with the client/rapist, the Ninth Circuit observed as
3 relevant to the third element of the sexual harassment claim, that is, whether an environment
4 is sufficiently hostile or abusive to alter the conditions of employment, that not only had
5 there been no remediation, the harassment was arguably reinforced by the plaintiff's
6 employer.  Id., at 966-67.  Unlike in Stanley, discussed above, the plaintiff in Little had
7 presented facts sufficient to show that the employer's indifference had resulted in harassment
8 or rendered her vulnerable to harassment.  The issue in Little did not concern the timeliness
9 of the plaintiff's charge but rather, consideration of the underlying conduct regarding whether
10 the defendant was entitled to summary judgment on the merits of plaintiff's claim.

11 In the instant case, it is undisputed that Plaintiff had no further contact with Dr. Roy
12 following approximately ten days after October 29, 2001. It further is undisputed that
13 Plaintiff, an employee of Wyeth, and Dr. Roy, who is not an employee of Wyeth, did not
14 work in the same building, workplace or vicinity. It further is undisputed that Wyeth told
15 Plaintiff immediately upon her report of the incident that Plaintiff would have no further
16 contact with Dr. Roy.  In fact, Wyeth prohibited Dr. Roy from speaking in Area 92 which
17 was Plaintiff's territory. There is no evidence in the record that any sexually-harassing-type
18 behavior, that is, verbal or physical conduct of a sexual nature, extended to anyone or at
19 anytime beyond Plaintiff's interaction with Dr. Roy between October 25, 2001 and ten days
20 after October 29, 2001.

21 Plaintiff has not shown that the actions taken by Wyeth following her report of Dr.
22 Roy's allegedly sexually harassing conduct amounted to indifference so as to constitute
23 further harassment of the same nature or as to render her vulnerable to harassment.  It
24 therefore appears that Plaintiff's claim of hostile work environment based on sexual
25 harassment is time-barred.

26     (2)    <u>Wyeth's argument for summary judgment as to the merits of Plaintiff's sexual harassment claim</u>.
27
28

1  In the alternative, the Court considers Defendant Wyeth's motion for summary
2  judgment addressing the merits of Plaintiff's claim of hostile work environment based on
3  sexual harassment. Wyeth contends that Plaintiff's sexual harassment claim is "fatally
4  flawed" because Plaintiff has failed to show that the alleged conduct was "severe or
5  pervasive." Sexual harassment is actionable under Title VII only if the conduct alleged is
6  "so severe or pervasive as to alter the conditions of [the plaintiff's] employment and create
7  an abusive working environment." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270
8  (2001)(quoting Faragher v. Boca Raton, 524 U.S. 775, 786 (1998)). Simple teasing, offhand
9  comments and isolated incidents, unless extremely serious, will not amount to discriminatory
10 changes in the terms and conditions of employment. Conduct must be extreme to amount to
11 a change in the terms and conditions of employment. Faragher, 524 U.S. at 788. In
12 determining whether an environment qualifies as hostile or abusive, courts look to the
13 frequency of the discriminatory conduct, its severity, whether it is physically threatening or
14 humiliating or a mere offensive utterance, and whether it unreasonably interferes with an
15 employee's work performance. Breeden, 532 U.S., at 270-71; Faragher, 524 U.S., at 788.

16 Defendant Wyeth further contends that it took prompt and reasonable steps to remedy
17 the situation. It is undisputed that Dr. Roy was not Plaintiff's supervisor and had no
18 supervisory authority over Plaintiff. In a non-supervisor harassment case, "the employer
19 cannot be held liable unless it reacts negligently to the harassment complaint." See Swenson
20 v. Potter, 271 F.3d 1184, 1196 (9th Cir. 2001); Distasio v. Perkin Elmer Corp., 157 F.3d 55,
21 63 (2d Cir. 1998).

22 In considering Defendant's argument, the Court has reviewed Brooks v. City of San
23 Mateo, 229 F.3d 917 (9th Cir. 2000), cited by Wyeth in its reply. In Brooks, the plaintiff and
24 her co-worker Steven Selvaggio, both city police department dispatchers, were at work on
25 the evening shift. Selvaggio approached the plaintiff while she was taking a call and placed
26 his hand on her stomach, commenting on its softness and sexiness. Plaintiff Brooks told him
27 to stop touching her and pushed him away. Undeterred, Selvaggio later positioned himself
28 behind the plaintiff's chair, boxing her in against the communications console as she was

1  taking a 911 call. Selvaggio forced his hand underneath her sweater and bra to fondle her
2  bare breast. After terminating the call, the plaintiff removed Selvaggio's hand and told him
3  he had "crossed the line." Selvaggio verbally responded with a comment of a sexual nature
4  and then approached the plaintiff as if he would fondle her breasts again. Selvaggio ceased
5  his behavior when another dispatcher arrived. The plaintiff immediately reported the incident
6  and the next day Selvaggio was placed on administrative leave pending an investigation. It
7  turned out that Selvaggio had made similar improper advances to co-workers but these earlier
8  victims had not reported his misconduct. The city determined that Selvaggio had violated
9  its sexual harassment policy. Selvaggio resigned after the city initiated termination
10 proceedings against him. He later pleaded no contest to misdemeanor sexual assault and
11 spent 120 days in jail. Id., at 922-23.

12 The plaintiff in Brooks took a leave of absence immediately after the incident and
13 began seeing a psychologist. She returned to work six months later and claimed that her
14 male co-workers ostracized her and her supervisors mistreated her. She claimed to have
15 trouble getting her desired work shift and preferred vacation dates, that approval of her sick
16 leave benefits was delayed, and she was reprimanded for conduct the city overlooked in
17 other employees. She also claimed to have received an unwarranted negative performance
18 evaluation. The plaintiff left work while her appeal of the evaluation was pending.

19 In Brooks, the district court granted defendants' motions for summary judgment,
20 holding that Selvaggio's sexual assault of the plaintiff was not severe enough to give rise to
21 a hostile work environment claim. The Ninth Circuit affirmed, holding that the plaintiff "was
22 harassed on a single occasion for a matter of minutes in a way that did not impair her ability
23 to do her job in the long-term, especially given that the city took prompt steps to remove
24 Selvaggio from the workplace." Id., at 926. The appellate court discussed other cases with
25 similar facts which had held that the alleged harassment was insufficient to constitute a
26 hostile work environment, including, *inter alia*, Saxton v. American Tel. & Telegraph Co.,
27 10 F.3d 526, 528 534 (7th Cir. 1993)(finding insufficient harassment to constitute a hostile
28 work environment where plaintiff was rubbed and kissed on one occasion, and resisted an

- 14 -

1 attempted groping on another). In addition to Brooks, Wyeth has referred the Court to
2 LeGrand v. Area Resources for Community & Human Servs., 394 F.3d 1098 (8th Cir. 2004),
3 in which the Eighth Circuit rejected as not severe or pervasive the claim that a board member
4 kissed the employee on the mouth, grabbed his buttocks and brushed his genitals with the
5 back of hand.

6       The Court has considered the circumstances discussed in Brooks in contrast to the
7 facts at issue in Little v. Windermere Relocation, Inc., supra. The plaintiff in Little was raped
8 three times during a single evening by a business associate.  It could be inferred from the
9 evidence that the plaintiff had been drugged and kidnapped. The plaintiff's employer made
10 no effort toward remediation and advised the plaintiff not to discuss the incident and then
11 reduced her salary.  The Ninth Circuit held that, considering the facts in the light most
12 favorable to the plaintiff because "her employer had effectively condoned a rape by a
13 business colleague and its effects, [the plaintiff in Little] was subjected to an abusive work
14 environment that 'detract[ed] from [her] job performance, discourage[d] [her] from remaining
15 on the job, [and kept her] from advancing in [her] career[].'" Id., 301 F.3d at 968. The Ninth
16 Circuit held that the plaintiff in Little had raised genuine issues of material fact as to whether
17 she was subjected to a hostile work environment and whether her employer could be liable
18 for the harassment. Id., at 968-69.

19       The Court has considered the undisputed facts of this case in the context of the factors
20 of the frequency and severity of the alleged conduct and the intensity of interference with
21 working conditions.  Dr. Roy's inappropriate conduct included his unwelcome invitation to
22 Plaintiff to come to his hotel room and his sexual advances involving a kiss and groping of
23 Plaintiff's thigh on October 24th, followed by Dr. Roy's two phone calls with sexual
24 overtones that occurred within four days after the incident. While certainly offensive, Dr.
25 Roy's conduct is akin to that discussed in Brooks and the cases cited therein where the
26 plaintiff was held not to have alleged harassment severe enough to support a hostile work
27 environment claim.  Moreover, as in Brooks, Defendant Wyeth took immediate steps to
28 ensure that Plaintiff had no further contact with Dr. Roy. Wyeth management assured

1  Plaintiff that she would have no further contact with Dr. Roy. Wyeth prohibited Dr. Roy
2  from speaking in Plaintiff's territory. It is undisputed that Plaintiff never saw Dr. Roy again
3  after October 24th. Wyeth took steps to ensure that no female employee was alone with Dr.
4  Roy during his speaking engagements for the company. Wyeth discontinued using Dr. Roy
5  as a speaker when his contract expired. There is no evidence that Wyeth ratified or
6  acquiesced in the alleged harassment. Defendant Wyeth's motion for summary judgment is
7  granted as to Plaintiff's Title VII claim for hostile work environment based on sexual
8  harassment.

9        (3) <u>Wyeth's motion for summary judgment on Plaintiff's retaliation claim</u>.

10        To make out a prima facie case of retaliation, a plaintiff must show (1) that she
11  engaged in protected activity; (2) that she suffered an adverse employment action; and (3)
12  there was a causal link between her activity and the employment decision. <u>Raad v. Fairbanks
13  N. Star Borough</u>, 323 F.3d 1185, 1196-97 (9th Cir. 2003)(citing <u>McDonnell Douglas Corp.
14  v. Green</u>, 411 U.S. 792, 802-04 (1973)). Only non-trivial employment actions that would
15  deter reasonable employees from complaining about Title VII violations will constitute
16  actionable retaliation. <u>Brooks</u>, 229 F.3d at 928. "Among those employment decisions that
17  can constitute an adverse employment action are termination, dissemination of a negative
18  performance reference, issuance of an undeserved negative performance review and refusal
19  to consider for promotion." <u>Id</u>.

20        To rebut the prima facie case, absent direct evidence, the burden shifts to the
21  defendant to "articulate" a legitimate, non-discriminatory reason for the adverse employment
22  action. <u>See</u> <u>Hashimoto v. Dalton</u>, 118 F.3d 671, 679 (9th Cir. 1997). If the defendant
23  articulates a legitimate, non-discriminatory reason for the adverse employment action, the
24  burden shifts to the plaintiff to show that the defendant's proffered reasons are a "pretext" to
25  conceal its true discriminatory motive. <u>Id</u>.; <u>see</u> <u>also</u>, <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d
26  1217, 1221 (9th Cir. 1998). Plaintiff must come forward with "specific substantial evidence"
27  of pretext. <u>Id</u>.
28

1    In this case, Plaintiff reported Dr. Roy's alleged sexually harassing conduct to her
2 supervisors on October 25, 2001. She contends that she was performing her job in a
3 satisfactory manner at the time but following her complaint she was placed on a PIP in
4 November 2001 that was extended until her employment termination. Plaintiff further
5 contends that she was subjected to heightened scrutiny concerning her employment
6 performance, including numerous unnecessary "field supervision evaluations" by her
7 supervisor, Mr. Dickinson, and given an unwarranted negative performance evaluation of
8 "below expectations" on December 13, 2002. Plaintiff's employment was terminated in April
9 2003. Of these complained of actions, the alleged "unwarranted negative performance
10 evaluation" on December 13, 2002, possibly the PIP if unwarranted, and Plaintiff's
11 employment termination constitute adverse employment actions. For purposes of these
12 summary judgment proceedings, the Court will assume that Plaintiff's complaint concerning
13 Dr. Roy's behavior was protected activity and that she has demonstrated a "causal link"
14 between her complaint and the employment decisions involving the PIP, the "unwarranted
15 negative performance evaluation" on December 13, 2002 and her employment termination
16 in April 2003.

17    The burden therefore shifts to Defendant Wyeth to "articulate" a legitimate, non-
18 discriminatory reason for the adverse employment action. Wyeth's undisputed facts show
19 that there were discussions among Wyeth's managers regarding Plaintiff's deficient
20 performance before the incident involving Dr. Roy. Plaintiff refused to go on "ride alongs"
21 with Mr. Dickinson, her supervisor, even though that activity was part of her PIP. Plaintiff
22 drove a company car while she had a suspended driver's license for months. Doctors in her
23 territory complained that she was not calling on them. She stopped entering calls to doctors'
24 offices after February 18, 2003. Plaintiff admitted she was not working full time as required
25 but failed to discuss her self-assumed employment arrangement with anyone at Wyeth.
26 Wyeth also emphasizes that Ms. Daniels reported the alleged October 25, 2001 incident of
27 a sexual nature involving Dr. Roy and no adverse action was taken against her. The Court
28 finds that Defendant Wyeth has satisfied its burden of articulating legitimate, non-

discriminatory reasons for Plaintiff's negative performance evaluation and employment termination.

The issue is whether at this stage on summary judgment proceedings Plaintiff has demonstrated the existence of evidence to create a genuine issue of material fact as to whether the reasons proffered by Defendant for the adverse employment actions were a pretext for discrimination. Plaintiff has cited the following circumstances in support of her argument that Wyeth's motives were retaliatory. Wyeth had a significant financial motive to protect its relationship with Dr. Roy because he endorsed Wyeth's medical products and because of the negative publicity regarding Wyeth's hormone replacement therapy products. Co-employee Bob Joice who had worked at Wyeth for 20 years testified during deposition that he knew of no sales representatives who consistently received overall "meets expectations" ratings that were placed on a PIP. Audrey Ozols, Plaintiff's direct supervisor, did not tell April Vaughn she was considering placing Plaintiff on a PIP. Other sales representatives noticed that Plaintiff was being singled out for "more harsh treatment." When Plaintiff returned from her stress-related leave of absence, Mr. Dickinson, Plaintiff's supervisor, told her there were going to be layoffs and she was ranked at the bottom of the district. Plaintiff's supervisors have a history of retaliatory conduct as evidenced by an EEOC "cause finding" in another case. Wyeth management refused to accommodate her request to "ride along" with a different manager than Mr. Dickinson knowing that she had been on a medical leave of absence due to stress.

Even if the above facts are considered as true, Plaintiff has not shown that Defendant Wyeth's employment actions were pretextual. The undisputed evidence shows that Plaintiff's supervisor Ms. Ozols contemplated placing Plaintiff on a PIP and discussed the matter with Ms. Vaughn and Ms. Kidd before the incident involving Dr. Roy. Doctors' offices complained about Plaintiff's lack of service. Plaintiff ceased working full time but failed to contact Wyeth's Human Resources Department about the matter. Plaintiff drove a company car while having a suspended license. This activity justified Defendant's employment

1 termination decision as to Plaintiff. Defendant Wyeth's motion for summary judgment on
2 Plaintiff's claim of retaliation is granted.

3 B.     Plaintiff's remaining state law claims.

4 Plaintiff's remaining claims are state law claims based on Arizona law. Defendant Wyeth has moved for summary judgment as to Plaintiff's claims for negligent supervision and intentional infliction of emotional distress. Defendant Dr. Roy has moved for summary judgment on Plaintiff's state law tort claims for civil battery and intentional infliction of emotional distress and as to Plaintiff's claim for punitive damages.

9 Under 28 U.S.C. § 1367(c)(3), this Court may decline to exercise supplemental jurisdiction over related state law claims, if it has "dismissed all claims over which it has original jurisdiction." The court has a measure of discretion when deciding whether to continue to exercise supplemental jurisdiction over state claims when all federal claims are eliminated before trial. Les Shockley Racing, Inc. v. National Hot Rod Ass'n, 884 F.2d 504, 509 (9th Cir. 1989). In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered will point toward declining to exercise jurisdiction of the state-law claims. See, Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1189 (9th Cir. 2001). This Court has considered the factors of judicial economy, convenience, fairness and comity.

19 Plaintiff's remaining state law claims concern factual allegations that are more directly related to Dr. Roy's alleged conduct. One of the remaining claims is the civil battery claim against Dr. Roy. Neither party has cited an Arizona case that discusses whether an unwelcome kiss is actionable as a civil battery. Because it does not appear that this issue has been addressed in the Arizona courts, the issue of liability is not clear. Therefore, as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law, the Court declines to continue exercising supplemental jurisdiction over Plaintiff's state claims. Plaintiff's state law claims are dismissed without prejudice.

1 **Accordingly**,

2 **IT IS ORDERED** that Defendant Wyeth's motion for summary judgment (Doc. 111)
3 is granted as to Plaintiff's federal law claims asserted Defendant Wyeth (Counts One and
4 Two).

5 **IT IS FURTHER ORDERED** that Defendant Wyeth's motion for summary
6 judgment (Doc. 111) is dismissed without prejudice as to Plaintiff's state law claims.

7 **IT IS FURTHER ORDERED** that Defendant Roy's motion for summary judgment
8 (Doc. 109) is dismissed without prejudice as to Plaintiff's state law claims.

9 **IT IS FURTHER ORDERED** that Plaintiff's state law claims are dismissed without
10 prejudice to the right to re-assert these claims in state court.

11 DATED this 27th day of March, 2006.

_____
Mary H. Murguia
United States District Judge